William W. Pearson (#012845)
**PEARSON LAW GROUP LLC**
3509 E. Shea Blvd., Ste. 117
Phoenix, Arizona 85028
Telephone:  602.320.4344
Email: wink@pearsonlg.com

*Attorneys for Berendo Property
and Harrison Properties, L.L.C.*

Todd R. Kerr (#013286)
P. Derek Petersen (#025683)
**PERKINS COIE LLP**
2901 North Central Avenue, Ste. 2000
Phoenix, Arizona 85012-2788
Telephone:  602.351.8000
Email: tkerr@perkinscoie.com
        pdpetersen@perkinscoie.com
        docketphx@perkinscoie.com

*Attorneys for Lincoln Industrial, L.L.C. and
Predio Management LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| BERENDO PROPERTY, a California general partnership; HARRISON PROPERTIES, L.L.C., an Arizona limited liability company; LINCOLN INDUSTRIAL, L.L.C., an Arizona limited liability company; and PREDIO MANAGEMENT LLC, an Arizona limited liability company,<br><br>    Plaintiffs,<br><br>    v.<br><br>CLOSED LOOP REFINING AND RECOVERY, INC., an Arizona corporation; ACE METAL CORPORATION; ADVANCED COMPUTER RECYCLING, INC.; AK RECYCLING, INC.; ALIANZA RECYCLING AND RECOVERY, LLC; ALL E WASTE, INC.; ALL GREEN ELECTRONICS RECYCLING, LLC; AMERICAN RETROWORKS, INC., d/b/a GOOD POINT RECYCLING; ATTAN RECYCLING, CORP.; CALIFORNIA ELECTRONIC WASTE, LLC; CALIFORNIA ELECTRONIC ASSET RECOVERY; CINCO ELECTRONICS RECYCLING, INC.; COMPUPOINT USA | No. _____<br><br>**COMPLAINT**<br><br>(Jury Trial Requested) |

1  LLC; DANNY EWASTE LLC; DESERT ARC;
   DYNAMIC RECYCLING, INC., n/k/a
2  DYNAMIC LIFECYCLE INNOVATIONS
   INC.; ECO INTERNATIONAL LLC;
3  ENVIRONMENTAL COORDINATION
   SERVICES AND RECYCLING, INC.;
4  EGREEN-IT SOLUTIONS, L.L.C.;
   ELECTRONIC RECYCLING SOLUTIONS
5  LLC; EWASTE CENTER, INC.; E-WASTE
   RECYCLERS OF COLORADO; E-WASTE
6  LLC; E-WORLD RECYCLERS, LLC;
   EXECUTIVE RECYCLING SERVICES, LLC;
7  FMI RECYCLING; GLOBAL ELECTRIC
   ELECTRONIC PROCESSING; GLOBAL
8  ELECTRONIC RECYCLING, LLC; GLOBAL
   ERECYCLERS, INC.; GLOBAL SURPLUS
9  SOLUTIONS, INC.; GREENVIEW
   RESOURCE MANAGEMENT INC.; IMS
10 ELECTRONICS RECYCLING, INC.; KYO
   COMPUTER INC.; MAGIC RECYCLING,
11 LLC; MONITOR AND CRT RECYCLERS OF
   CALIFORNIA; OC RECYCLING, INC.; PC
12 RECYCLE LLC; PRECISE RECYCLING
   SERVICES, INC.; ROUND2 INC.; RUUHWA
13 DANN AND ASSOCIATES, INC., d/b/a CAL
   MICRO II; SCRAPCOMPUTER.COM USA,
14 INC.; SOUTHWEST RECYCLING
   SOLUTIONS LLC; TEXAS GREEN
15 ELECTRONIC RECYCLING COMPANY
   LLC; TRI PRODUCTS, INC.; TUNG TAI
16 GROUP; FEDERAL PRISON INDUSTRIES,
   INC., d/b/a UNICOR; U.S. MICRO
17 DEVELOPMENT CORPORATION; VTKK,
   LLC; YNOT RECYCLE LLC; and GOLD'N
18 WEST SURPLUS, INC.,

19            Defendants.

20     Berendo Property ("Berendo"), Harrison Properties, L.L.C. ("Harrison"), Lincoln

21 Industrial, L.L.C. ("Lincoln"), and Predio Management LLC ("Predio") (collectively

22 "Plaintiffs") allege as follows for their Complaint against Closed Loop Refining and

23 Recovery, Inc. ("Closed Loop") and the Arranger/Transporter Defendants (identified

24 individually below):

25                          **NATURE OF ACTION**

26     1.     This civil action arises from Defendants' abandonment and disposal of

27 approximately 195 million pounds of used or broken cathode ray tubes ("CRTs") and CRT

28

1    crushed glass (collectively, "CRT Waste") in Arizona.  CRTs are vacuum tubes, made
2    primarily of glass, which constitute the video display components of outdated television,
3    computer monitor, and other electronic devices.  CRTs contain an average of four pounds
4    of lead, which is a hazardous substance under the Comprehensive Environmental,
5    Response, Compensation, and Liability Act ("CERCLA").

6        2.      Plaintiffs seek cost recovery, declaratory relief, and common law damages
7    resulting from releases or threatened releases of hazardous substances caused by Defendant
8    Closed Loop and the Arranger/Transporter Defendants at:  (1) a warehouse owned by
9    Plaintiffs Berendo and Harrison ("Berendo/Harrison") located within 435 S. 59th Avenue,
10   Phoenix, Arizona ("59th Ave Warehouse"); and (2) a warehouse owned and managed by
11   Plaintiffs Lincoln and Predio ("Lincoln/Predio") located at 625 S. 27th Avenue, Phoenix,
12   Arizona ("27th Ave. Warehouse") (together, the "Properties").  Plaintiffs' claims for relief
13   arise under (i) CERCLA, 42 U.S.C. §§ 9601-9675; (ii) the Declaratory Judgment Act, 28
14   U.S.C. §§ 2201-2202; and (iii) principles of common law.

15                          **JURISDICTION AND VENUE**

16       3.      This Court has original jurisdiction over this civil action pursuant to 42 U.S.C.
17   § 9613(b), 18 U.S.C. § 1965, and 28 U.S.C. § 2201.

18       4.      This Court has supplemental jurisdiction over the Plaintiffs' state law claims
19   pursuant to 28 U.S.C. § 1367, because the state law claims are so related to Plaintiffs'
20   federal claims that they form a part of the same case or controversy.

21       5.      Venue is proper under 42 U.S.C. § 9613(b), 18 U.S.C. § 1965(a), and 28
22   § 1391(b), because a substantial part of the events or omissions giving rise to this lawsuit
23   occurred within this District, including the damages and the release and/or threatened
24   release of hazardous substances, and because the Properties that are the subject of this action
25   are located in this District.

26

27

28

1

## PARTIES

2
I.       PLAINTIFFS.

3          6.      Plaintiff Berendo Property, a California general partnership, is the
4 owner/landlord of the 59th Ave. Warehouse.

5          7.      Plaintiff Harrison Properties, L.L.C., an Arizona limited liability company, is
6 an owner/manager of the 59th Ave. Warehouse.

7          8.      Plaintiff Lincoln Industrial, L.L.C., an Arizona limited liability company, is
8 the owner/landlord of the 27th Ave. Warehouse.

9          9.      Plaintiff Predio Management LLC, an Arizona limited liability company, is
10 the designated property manager of the 27th Ave. Warehouse.

11
II.      DEFENDANTS.

12          10.     Defendant Closed Loop Refining and Recovery, Inc. ("Closed Loop") is a
13 corporation organized under the laws of the State of Arizona, with a principal place of
14 business in Phoenix, Arizona.  Beginning in 2010 and extending into 2016, Closed Loop
15 was a tenant occupying the Properties.

16          11.     Defendant Ace Metal Corporation ("Ace") is a corporation organized under
17 Washington state law.  Upon information and belief, Ace arranged for the transport,
18 treatment, and disposal of at least 1,006,166 pounds of CRT Waste at the Properties.

19          12.     Defendant Advanced Computer Recycling, Inc. ("Advanced Comp.") is a
20 corporation organized under California state law.  Upon information and belief, Advanced
21 Comp. arranged for the transport, treatment, and disposal of at least 1,565,316 pounds of
22 CRT Waste at the Properties.

23          13.     Defendant AK Recycling, Inc. ("AK") is a corporation organized under
24 California state law.  Upon information and belief, AK arranged for the transport, treatment,
25 and disposal of at least 73,697 pounds of CRT Waste at the Properties.

26          14.     Defendant Alianza Recycling and Recovery, LLC ("Alianza") is a limited
27 liability company organized under Arizona state law.  Alianza arranged for the transport
28 and disposal of at least 4,568,003 pounds of CRT Waste at the Properties.

15.     Defendant All E Waste, Inc. ("All E Waste") is a corporation organized under California state law.  Upon information and belief, All E Waste arranged for the transport, treatment, and disposal of at least 208,736 pounds of CRT Waste at the Properties.

16.     Defendant All Green Electronics Recycling, LLC ("All Green") is a limited liability company organized under California state law.  Upon information and belief, All Green arranged for the transport, treatment, and disposal of at least 228,121 pounds of CRT Waste at the Properties.

17.     Defendant American Retroworks, Inc., d/b/a Good Point Recycling ("Good Point") is a corporation organized under Delaware state law.  Upon information and belief, Good Point arranged for the transport, treatment, and disposal of at least 34,397 pounds of CRT Waste at the Properties.

18.     Defendant Attan Recycling Corp. ("Attan") is a corporation organized under California state law.  Upon information and belief, Attan arranged for the transport, treatment, and disposal of at least 4,710,246 pounds of CRT Waste at the Properties.

19.     Defendant California Electronic Waste, LLC ("CEW") is a limited liability company organized under California state law.  Upon information and belief, CEW arranged for the transport, treatment, and disposal of at least 636,360 pounds of CRT Waste at the Properties.

20.     Defendant California Electronic Asset Recovery ("CEAR") is a corporation organized under California state law.  Upon information and belief, CEAR arranged for the transport, treatment, and disposal of at least 14,918,023 pounds of CRT Waste at the Properties.

21.     Defendant Cinco Electronics Recycling, Inc. ("Cinco") is a corporation organized under Texas state law.  Upon information and belief, Cinco arranged for the transport, treatment, and disposal of at least 53,712 pounds of CRT Waste at the Properties.

22.     Defendant CompuPoint USA LLC ("CompuPoint") is a limited liability company organized under Georgia state law.  Upon information and belief, CompuPoint

arranged for the transport, treatment, and disposal of at least 71,670 pounds of CRT Waste at the Properties.

23.     Defendant Danny E-waste LLC ("Danny") is a limited liability company organized under California state law.  Upon information and belief, Danny arranged for the transport, treatment, and disposal of at least 3,481,249 pounds of CRT Waste at the Properties.

24.     Defendant Desert Arc is a 501(c)(3) entity that operates a recycling center in Indio, California.  Upon information and belief, Desert Arc arranged for the transport, treatment, and disposal of at least 10,443 pounds of CRT Waste at the Properties.

25.     Defendant USA Dynamic Recycling, Inc., n/k/a Dynamic Lifecycle Innovations Inc. ("Dynamic"), is a corporation organized under Wisconsin state law.  Upon information and belief, Dynamic arranged for the transport, treatment, and disposal of at least 327,669 pounds of CRT Waste at the Properties.

26.     Defendant Eco International LLC ("Eco") is a limited liability company organized under New York state law.  Upon information and belief, Eco arranged for the transport, treatment, and disposal of at least 1,117,153 pounds of CRT Waste at the Properties.

27.     Defendant Environmental Coordination Services and Recycling, Inc. ("Envt'l. Coord.") is a corporation organized under Pennsylvania state law.  Upon information and belief, Envt'l. Coord. arranged for the transport, treatment, and disposal of at least 187,214 pounds of CRT Waste at the Properties.

28.     Defendant eGreen-IT Solutions, L.L.C. ("eGreen") is a limited liability company organized under Arizona state law.  Upon information and belief, eGreen arranged for the transport, treatment, and disposal of at least 60,754 pounds of CRT Waste at the Properties.

29.     Defendant Electronic Recycling Solutions LLC ("ERS") is a limited liability company organized under Utah state law.  Upon information and belief, ERS arranged for

the transport, treatment, and disposal of at least 1,589,681 pounds of CRT Waste at the Properties.

30.     Defendant eWaste Center, Inc. ("eWaste Center") is a corporation organized under California state law.  Upon information and belief, eWaste Center arranged for the transport, treatment, and disposal of at least 2,032,995 pounds of CRT Waste at the Properties.

31.     Defendant E-Waste Recyclers of Colorado ("E-Waste Recyclers") is a corporation organized under Colorado state law.  Upon information and belief, E-Waste Recyclers arranged for the transport, treatment, and disposal of at least 317,619 pounds of CRT Waste at the Properties.

32.     Upon information and belief, Defendant E-Waste LLC ("E-Waste") is a limited liability company organized under Washington state law.  Upon information and belief, E-Waste arranged for the transport, treatment, and disposal of at least 2,408,885 pounds of CRT Waste at the Properties.

33.     Upon information and belief, Defendant E-World Recyclers, LLC ("E-World") is a limited liability company organized under California state law.  Upon information and belief, E-World arranged for the transport, treatment, and disposal of at least 1,961,305 pounds of CRT Waste at the Properties.

34.     Upon information and belief, Defendant Executive Recycling Services, LLC ("Executive") is a limited liability company organized under Colorado state law.  Upon information and belief, Executive arranged for the transport, treatment, and disposal of at least 151,186 pounds of CRT Waste at the Properties.

35.     Upon information and belief, Defendant FMI Recycling ("FMI") is a company with its principal place of business in Dallas, Texas.  Upon information and belief, FMI arranged for the transport, treatment, and disposal of at least 97,351 pounds of CRT Waste at the Properties.

36.     Upon information and belief, Defendant Global Electric Electronic Processing Inc. ("GEEP") is a corporation organized under North Carolina state law.  GEEP

arranged for the transport, treatment, and disposal of at least 4,140,666 pounds of CRT Waste at the Properties.

37.    Records indicate that GEEP arranged for the transport of CRT Waste to the Properties from at least four different locations: (a) GEEP Alberta; (b) GEEP Calgary; (c) GEEP Costa Rica; and (d) GEEP Michigan.

38.    Upon information and belief, Defendant Global Electronic Recycling, LLC ("Global Elec.") is a limited liability company organized under Arizona state law.  Upon information and belief, Global Elec. arranged for the transport, treatment, and disposal of at least 15,360 pounds of CRT Waste at the Properties.

39.    Upon information and belief, Defendant Global eRecyclers, Inc. ("Global eRecyclers") is a corporation organized under California state law.  Upon information and belief, Global eRecyclers arranged for the transport, treatment, and disposal of at least 511,675 pounds of CRT Waste at the Properties.

40.    Upon information and belief, Defendant Global Surplus Solutions, Inc. ("Global Surplus") is a corporation organized under California state law.  Upon information and belief, Global Surplus arranged for the transport, treatment, and disposal of at least 1,213,067 pounds of CRT Waste at the Properties.

41.    Upon information and belief, Defendant Greenview Resource Management Inc. ("Greenview") is a corporation organized under California state law.  Upon information and belief, Greenview arranged for the transport, treatment, and disposal of at least 4,398,323 pounds of CRT Waste at the Properties.

42.    Upon information and belief, Defendant IMS Electronics Recycling, Inc. ("IMS") is a corporation organized under California state law.  Upon information and belief, IMS arranged for the transport, treatment, and disposal of at least 71,487,000 pounds of CRT Waste at the Properties.

43.    Upon information and belief, Defendant KYO Computer Inc. ("KYO") is a corporation organized under California state law.  Upon information and belief, KYO

arranged for the transport, treatment, and disposal of at least 6,346,634 pounds of CRT Waste at the Properties.

44.     Upon information and belief, Defendant Magic Recycling, LLC ("Magic") is a limited liability company organized under Colorado state law.  Upon information and belief, Magic arranged for the transport, treatment, and disposal of at least 39,238 pounds of CRT Waste at the Properties.

45.     Defendant Monitor and CRT Recyclers of California ("Monitor") has its principal place of business in Riverside, California.  Upon information and belief, Monitor arranged for the transport and disposal of at least 25,984,598 pounds of CRT Waste at the Properties.

46.     Upon information and belief, Defendant OC Recycling, Inc. ("OC") is a corporation organized under California state law.  Upon information and belief, OC for the transport, treatment, and disposal of at least 29,860 pounds of CRT Waste at the Properties.

47.     Upon information and belief, Defendant PC Recycle LLC ("PC") is a limited liability company organized under California state law.  Upon information and belief, PC arranged for the transport, treatment, and disposal of at least 598,655 pounds of CRT Waste at the Properties.

48.     Upon information and belief, Defendant Precise Recycling Services, Inc. ("Precise") is a corporation organized under California state law.  Upon information and belief, Precise arranged for the transport, treatment, and disposal of at least 73,147 pounds of CRT Waste at the Properties.

49.     Upon information and belief, Defendant Round2, Inc. ("Round2") is a corporation organized under Texas state law.  Round2 arranged for the transport and disposal of at least 4,294,760 pounds of CRT Waste at the Properties.

50.     Upon information and belief, Defendant Ruuhwa Dann and Associates, Inc., d/b/a Cal Micro Recycling ("Cal Micro"), is a corporation organized under California state law.  Upon information and belief, Cal Micro arranged for the transport, treatment, and disposal of at least 10,283,735 pounds of CRT Waste at the Properties.

51.     Upon information and belief, Defendant Scrapcomputer.com USA, Inc. ("Scrapcomputer") is a corporation organized under Arizona state law.  Upon information and belief, Scrapcomputer arranged for the transport, treatment, and disposal of at least 108,465 pounds of CRT Waste at the Properties.

52.     Upon information and belief, Defendant Southwest Recycling Solutions LLC ("Southwest") is a limited liability company organized under Arizona state law.  Upon information and belief, Southwest arranged for the transport, treatment, and disposal of at least 43,865 pounds of CRT Waste at the Properties.

53.     Upon information and belief, Defendant Texas Green Electronic Recycling Company LLC ("Texas Green") is a limited liability company organized under Texas state law.  Upon information and belief, Texas Green arranged for the transport, treatment, and disposal of at least 737,370 pounds of CRT Waste at the Properties.

54.     Upon information and belief, Defendant Tri Products, Inc. ("Tri Prods.") is a corporation organized under California state law.  Upon information and belief, Tri Prods. arranged for the transport, treatment, and disposal of at least 710,775 pounds of CRT Waste at the Properties.

55.     Upon information and belief, Defendant Tung Tai Group ("Tung Tai") is a corporation organized under California state law.  Upon information and belief, Tung Tai arranged for the transport, treatment, and disposal of at least 198,212 pounds of CRT Waste at the Properties.

56.     Upon information and belief, Defendant Federal Prisons Industries, Inc. (trade named "UNICOR"), is a wholly-owned government corporation pursuant to 31 U.S.C. § 9101(3)(E), with its headquarters in Yazoo City, Mississippi.  UNICOR arranged for the transport, treatment, and disposal of at least 14,381,531 pounds of CRT Waste at the Properties.

57.     Records indicate that UNICOR arranged for the transport of CRT Waste to the Properties from at least six different locations: (a) Marianna Federal Prison Industries, UNICOR Recycling, Marianna, Florida; (b) TXAR Federal Prison Industries, UNICOR

Recycling, Texarkana, Texas; (c) Lewisburg Federal Prison Industries, UNICOR Recycling, Lewisburg, Pennsylvania; (d) Tucson Federal Prison Industries, UNICOR Recycling, Tucson, Arizona; (e) Atwater Federal Prison Industries, UNICOR Recycling, Atwater, California; and, (f) Leavenworth Federal Prison Industries, UNICOR Recycling, Leavenworth, Kansas.

58.    Upon information and belief, Defendant U.S. Micro Development Corporation ("U.S. Micro") is a corporation organized under California state law.  Upon information and belief, U.S. Micro arranged for the transport, treatment, and disposal of at least 89,194 pounds of CRT Waste at the Properties.

59.    Upon information and belief, Defendant VTKK, LLC ("VTKK") is a limited liability company organized under Illinois state law.  Upon information and belief, VTKK arranged for the transport, treatment, and disposal of at least 80,664 pounds of CRT Waste at the Properties.

60.    Upon information and belief, Defendant YNot Recycle LLC ("YNot") is a limited liability company organized under California state law.  Upon information and belief, YNot arranged for the transport, treatment, and disposal of at least 956,201 pounds of CRT Waste at the Properties.

61.    Upon information and belief, Defendant Gold'n West Surplus, Inc. ("Gold'n West") is a corporation organized under California state law.  Upon information and belief, Gold'n West arranged for the transport, treatment, and disposal of at least 3,495 pounds of CRT Waste at the Properties.

## GENERAL ALLEGATIONS

### I.    CLOSED LOOP AND THE ARRANGER/TRANSPORTER DEFENDANTS COOPERATED IN A SHAM CRT RECYCLING SCHEME.

62.    Beginning in 2010, Defendant Closed Loop secured leases at the Properties based on false representations that Defendant Closed Loop would be operating recycling services in compliance with all federal and state hazardous waste laws.

63.     From 2010 until at least 2016, Defendant Closed Loop and the Arranger/Transporter Defendants cooperated in a sham recycling scheme to profit from the stockpiling and subsequent abandonment of approximately 195 million pounds (97,500 tons) of CRT Waste containing "hazardous substances" under CERCLA, 106 million pounds of which were abandoned at the Properties.

**A.     The Arranger/Transport Defendants' CRT Waste Operations.**

64.     Between 2010 and 2016, the Arranger/Transporter Defendants were paid to collect or otherwise accept used and/or broken CRTs that required treatment and/or disposal under state and federal environmental regulations.

65.     To avoid heavy regulatory obligations required when managing hazardous waste under the Resource Conservation and Recovery Act (RCRA), the Arranger/Transporter Defendants sought to take advantage of RCRA's conditional exclusion for used and broken CRTs (the "RCRA CRT Exclusion"), which excludes such CRTs from RCRA's hazardous waste management regulations if they are "destined for recycling" and certain other requirements are met.

66.     Given their experience and sophistication in the electronic waste ("e-waste") industry, the Arranger/Transporter Defendants knew or should have known that, among other things, the RCRA CRT Exclusion does not apply to (i) "sham recycling"—*e.g.*, any form of treatment or disposal being called recycling in an attempt to avoid RCRA regulations; (ii) operations involving speculative accumulation of CRT Waste, and/or (iii) use of CRT Waste in a manner constituting disposal.

67.     To take advantage of the RCRA CRT Exclusion, the Arranger/Transporter Defendants arranged to transport their used and/or broken CRTs to other companies, purportedly for "CRT processing" and "recycling."

68.     Because there was no legitimate market for selling used and/or broken CRTs between 2010 and 2016, the Arranger/Transporter Defendants were forced to pay other companies to accept their CRT Waste.  The Arranger/Transporter Defendants still profited from these arrangements by transferring possession of CRT Waste to other companies and,

in some instances, receiving reimbursement from the California Department of Resources Recycling and Recovery ("CalRecycle").

69.     Between 2010 and 2016, the Arranger/Transporter Defendants arranged for and paid Closed Loop to accept, treat, and/or dispose of their CRT Waste.

**B.     Closed Loop's Sham Recycling Operations.**

70.     In 2010, Closed Loop entered the e-waste processing and recycling industry and, for a price, offered to accept CRT Waste from the Arranger/Transporter Defendants for CRT processing.

71.     To undercut the national e-waste market and attract customers, Closed Loop accepted inbound CRTs at prices substantially below what other companies in the U.S. e-waste industry charged.

72.     Closed Loop speculatively accumulated used and broken CRTs and handled those CRTs in violation of the RCRA CRT Exclusion (*e.g.*, placing used and/or broken CRTs outside or in warehouses indefinitely).

73.     Closed Loop's "CRT processing" operations resulted in releases or threatened releases of hazardous substances contained in CRT Waste into the environment.  And Closed Loop failed to take reasonable measures to protect against such releases.

74.     Closed Loop also cross-contaminated CRT Waste by failing to adhere to standard industry practice of segregating leaded funnel glass from nonleaded panel glass during CRT processing to meet the product specifications of downstream lead smelters, because it is not economically viable for lead smelters to accept commingled glass from e-waste recyclers.

75.     Closed Loop's operations involved feeding both leaded funnel glass and panel glass into the same mechanical crusher, creating a stream of commingled leaded and nonleaded glass.

76.     The commingled leaded and nonleaded glass produced by Closed Loop between 2010 and 2016 was never destined for recycling at a CRT glass manufacturer or a

-13-

lead smelter, because it did not meet any commercial specification for which a legitimate market existed.

77.    Instead, Closed Loop stockpiled this ostensibly "processed" CRT glass at the Properties indefinitely, without any feasible means to recycle it.  In other words, Closed Loop speculatively accumulated this CRT glass and also mismanaged that CRT glass in violation of the RCRA CRT Exclusion.

78.    Outside the 59th Ave. Warehouse, Closed Loop deposited leaded glass and nonleaded glass in large, uncontained and uncovered piles causing releases or the potential for releases of hazardous substances into the surrounding environment.

79.    Closed Loop also failed to manage the processed CRT glass at the Properties in an environmentally responsible manner with a concern for product integrity.

80.    For example, it is standard industry practice to use new octagon Gaylord boxes to provide appropriate containment for processed CRT glass. On average, a Gaylord box can contain approximately 2 tons of materials.

81.    Instead of using new Gaylord boxes, Closed Loop repurposed many of the same four-sided Gaylord boxes that had previously been used to transport used, intact CRTs to the Properties.

82.    These boxes had, in turn, been repurposed from their initial use to package non-hazardous consumer products, which do not require the same standard of durability. As a result of Closed Loop's negligence, processed CRT glass spilled to the floor in both the 27th Ave. Warehouse and the 59th Ave. Warehouse.

83.    At the 59th Ave. Warehouse, Closed Loop also stored outside hundreds of pallets of processed CRT glass and partially processed CRTs in Gaylord boxes. The containers had deteriorated to the point that they could no longer hold the glass, and CRT glass and parts were strewn throughout the storage area.

**C.** **The Arranger/Transporter Defendants' Facilitated and Cooperated in Sham Recycling Operations.**

84.     The Arranger/Transporter Defendants failed to exercise reasonable care to inquire and confirm Closed Loop's compliance with environmental laws and regulations.

85.     Given their experience and sophistication in the e-waste industry, the Arranger/Transporter Defendants knew or had a reasonable basis to believe that Closed Loop was running a sham recycling operation.

86.     Between 2010 and 2016, the Arranger/Transporter Defendants knew that Closed Loop was (at best) only an "intermediate facility," did not a qualify as a final destination for CRT Waste recycling, and charged below-market prices for alleged recycling services.  The Arranger/Transporter Defendants knew and/or had an objectively reasonable basis for believing that Closed Loop had no feasible means for recycling the CRT glass—*e.g.*, Closed Loop was not a remanufacturer of CRT glass and has never engaged or had the capacity to engage in lead smelting.

87.     Despite their knowledge, between 2010 and 2016, the Arranger/Transporter Defendants arranged for Closed Loop to accept approximately 195 million pounds of CRT Waste, purportedly for "CRT processing." But 106 million pounds of that CRT Waste was abandoned at the Properties.

88.     Because no market existed in which the Arranger/Transporter Defendants could sell their CRTs, the Arranger/Transporter Defendants were forced to pay entities to take those CRTs.

89.     The Arranger/Transporter Defendants chose to ship their CRT Waste to Closed Loop, because Closed Loop charged substantially less for accepting and ostensibly "processing" CRT Waste than other companies in the e-waste industry.

90.     Given their experience and sophistication in the e-waste industry, at the time they sent CRT Waste to Closed Loop, the Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe both that Closed Loop's operations violated

environmental laws and regulations, and that the CRT Waste they arranged for and paid Closed Loop to accept was not destined for legitimate recycling.

91.     Between 2010 and 2016, it became widely known in the e-waste industry that the market for CRT glass in the United States had disappeared.

92.     Historically, CRTs collected for recycling were recycled into new CRTs through glass-to-glass recycling, or were sent to secondary lead smelters to recover the lead.

93.     By 2006, however, the advancement of flat screen televisions and computer monitors was displacing CRTs—sending demand for the manufacturing of new CRTs into rapid decline.

94.     Upon information and belief, the last U.S.-based CRT remanufacturing operations ceased in or about 2010, eliminating the primary way in which CRT Waste was recycled in the U.S.  Shortly thereafter, global CRT remanufacturing operations also closed or stopped accepting CRT Waste.

95.     Although a few North American lead smelters have accepted limited amounts of CRT glass, since no later than 2010, it was well known in the e-waste industry that those smelters lacked the capacity to recycle the vast amounts of CRT Waste in the United States.

96.     During this period, it became widely known in the e-waste industry that (i) no viable market existed for CRT Waste; (ii) companies across the U.S. were running scam recycling operations in which they collected payments to accept and/or purportedly "process" CRT Waste for recycling, but instead stockpiled, abandoned, and/or otherwise disposed of the CRT Waste; and (iii) millions of pounds of CRT Waste had been abandoned or otherwise disposed of at locations around the country.

97.     Between 2010 and 2016, several e-waste abandonments and related environmental enforcement actions were widely reported in the media and by regulatory agencies. Any participant in the tight-knit e-waste recycling industry would have been aware of the trend, including the Arranger/Transporter Defendants.

98.     Between 2010 and 2016, it became widely known in the e-waste industry and was known or should have been known by the Arranger/Transporter Defendants that Closed Loop was not operating in compliance with federal and state hazardous waste laws.

99.     In 2013, for example, Basel Action Network ("BAN")—an environmental non-profit group that describes itself as an investigative watchdog for sham electronic waste recyclers—provided the following public comments about Closed Loop:

> This is an important matter because an influx of cash comes into a business of this kind upon receipt of CRT glass and the actual subsequent processing of the CRTs is a very large subsequent expense. The economic temptation to avoid [the] latter costs, in the face of large influxes of cash is real and thus holding to Speculative Accumulation rules is vital unless there is a clear pathway for meeting the processing goals, and avoiding accumulation is seen as a reality in the near term. Already numerous CRT storage-for-later processing sites around the nation have been found abandoned with massive amounts of glass still on site due to this factor (*see* Luminous Recycling, Denver, Dow Management, Yuma).

100.    BAN's public statements regarding Defendant Closed Loop's situation were widely disseminated and known to participants in the industry, including the Arranger/Transporter Defendants which had the requisite sophistication and experience in the e-waste industry to appreciate BAN's public warning regarding the "economic temptation" for Defendant Closed Loop to circumvent the speculative accumulation regulations in exchange for "large influxes of cash."

101.    The Arranger/Transporter Defendants nevertheless knowingly transported and/or arranged for the transport of tens of millions of pounds of CRTs and other e-waste to the Properties.

102.    Also in August 2013, at least one other recycler in the e-waste industry issued a public white paper acknowledging there was "insufficient capacity to manage the quantity of CRTs reaching end-of-life" and warning that recyclers "setting aside the cost of managing CRT glass while enjoying revenue from commodities is the largest contributor to stockpiling CRT glass."

103.    By 2014, the same recycler announced in a second white paper that CRT glass continues to be stockpiled in the industry; that existing end-use markets fall short of current demand; and that proposed future capacity is "at best, only available at some unknown point in the future (when the strongest demand exists today) or, at worst, speculative in nature."

104.    Also in 2014, the Wisconsin Department of Natural Resources ("Wisconsin DNR") issued a warning to e-waste recyclers that Closed Loop lacked the capacity to process CRTs and that any CRTs sent to Closed Loop would accordingly not be counted toward manufacturer credit under the E-Cycle Wisconsin Program.

105.    On September 23-24, 2014, Brent Benham of Defendant Closed Loop participated in the "Sustainable Materials Management Electronics Recycling Forum" ("SMM Forum") in Arlington, Virginia, which was hosted by the EPA as part of a nationwide effort "to address the challenges of Cathode Ray Tube (CRT) stockpiling." The SMM Forum began with the following "CRT Problem Statement":

> CRTs and CRT glass were once easily recycled into new CRTs; however, the demand for new CRTs has collapsed in favor of new flat panel technologies. Because of rising costs, negative economic incentives, and shifts in CRT glass markets, some CRT processors and recyclers are choosing to store the glass indefinitely rather than send it for recycling (or disposal), which increases the risk of mismanagement and/or abandonment of CRTs.

106.    During the same SMM Forum, the EPA publicly identified several "Factors Leading to the Problem" of stockpiled CRTs and CRT Waste, including that the "[f]inancial incentive for entities to get paid to receive CRTs and then not pay to recycle (or dispose)"; "[s]hipments out of state can't be regulated by original jurisdiction"; "[b]arriers to [market] entry are low"; and "[r]ecyclers aren't changing enough to cover costs for recycling."

107.    On or about November 6, 2014, E-Scrap News also reported that Brent Benham admitted that "Closed Loop has been amassing leaded glass instead of sending it downstream for recycling elsewhere." *See* E-Scrap News, "CRT Player Closed Loop Receives Notice of Violation" (Nov. 6, 2014).

108.     The Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe that, given the low prices they were paying, no e-waste company with Closed Loop's business model and low profit margin could have complied with applicable environmental laws and regulations—*e.g.*, the requirements to operate under the RCRA CRT Exclusion. Yet the Arranger/Transporter Defendants knowingly continued to ship CRT Waste to the Properties and profited from Closed Loop's below-market prices.

109.     Given their experience and sophistication in the e-waste industry, at the time they sent CRT Waste to Closed Loop, the Arranger/Transporter Defendants knew or had an objectively reasonable basis to know that Closed Loop was speculatively accumulating and/or managing CRTs in violation of state and federal environmental laws.

110.     From 2010 to 2016, Closed Loop accumulated approximately 161 million pounds of crushed CRT glass in Arizona, but shipped out only 4.4 million pounds (or 2.7%) of those same materials for purported "recycling."  Closed Loop speculatively accumulated the remaining 97.3% at the Properties and other locations in violation of federal regulations. At no time during its entire six-year operation was Closed Loop in compliance with the speculative accumulation requirements in 40 C.F.R. § 261.39(c).

111.     The Arranger/Transporter Defendants arranged to ship CRT Waste to Closed Loop without a reasonable or informed expectation that CRT Waste would be disposed of or treated in compliance with applicable environmental laws.

112.     Given their experience and sophistication in the e-waste industry, at the time they sent CRT Waste to Closed Loop, the Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe that Closed Loop's "CRT processing" operations violated state and federal environmental regulations and generated and deposited lead-containing dust throughout Closed Loop's facilities, resulting in releases or threatened releases of hazardous substances to the environment.

113.     Given their experience and sophistication in the e-waste industry, at the time they sent CRT Waste to Closed Loop, the Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe that Closed Loop's "CRT processing" created a

commingled stream of leaded and nonleaded glass, which did not meet any commercial specification for which a legitimate market existed.

114.    Given their experience and sophistication in the e-waste industry, at the time they sent CRT Waste to Closed Loop, the Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe that Closed Loop was speculatively accumulating "processed" CRT glass and/or otherwise managing it in violation of the CRT Exclusion (*e.g.*, placing CRT glass outside or in warehouses indefinitely).

115.    While making numerous deliveries to Defendant Closed Loop, drivers for the Arranger/Transporter Defendants observed that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

116.    Among several things, drivers of the Arranger/Transporter Defendants observed that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that such materials could not possibly be recycled during a single calendar year or otherwise as part of a legitimate and economically viable recycling program.

117.    The Arranger/Transporter Defendants also knew Defendant Closed Loop lacked other downstream markets to manage crushed CRT glass, because the lack of such downstream markets directly impacted the revenue streams of nearly every entity involved in the CRT recycling chain, including the Arranger/Transporter Defendants.

**D.    Closed Loop and the Arranger/Transporter Defendants Abandoned CRT Waste at the Properties.**

118.    In or about March 2016, Closed Loop abandoned the Properties and approximately 106 million pounds of its CRT Waste at the Properties, leaving Plaintiffs, as the landlords, to incur substantial removal and clean-up costs that may exceed $15 million.

119.    Closed Loop's sham recycling operations also extended to locations in Ohio where Closed Loop conducted a similar sham recycling operation.  In a bench trial by Closed Loop's Ohio landlord for breach of its Ohio lease, the Ohio state court ruled that:

Closed Loop was not engaged in legitimate CRT recycling operations at the Properties, but was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it. The testimony established that [the Closed Loop Defendants] also failed to segregate leaded funnel glass from panel glass during its CRT recycling operation, resulting in the abandonment of over 113 million pounds of crushed, commingled leaded and unleaded glass at the Properties in addition to approximately 15 million pounds of other electronic waste. . . . [A] legitimate CRT recycling operation at the Properties would not have commingled the CRT glass because the cross-contamination of leaded and unleaded glass would have rendered any available downstream recycling option unprofitable, i.e., no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise.

120.    RCRA established a cradle-to-grave program that regulates the generation, transportation, treatment, storage, and disposal of hazardous wastes and provides for the conditional exclusion for legitimate CRT operations, but only if required criteria are met. *See* 40 C.F.R. §§ 261.4(a)(22) & 261.39.

121.    Defendant Closed Loop failed to manage the used CRTs and crushed CRT glass at the Properties in compliance with the conditional CRT Exclusion because it speculatively accumulated CRT materials at the Properties in violation of such exclusion.

122.    Among other things, Defendant Closed Loop could not show that "during the calendar year--(commencing January 1)--the amount of material that is recycled, or transferred to a different site for recycling, equals at least 75 per cent by weight or volume of the amount of that material accumulated at the beginning of the period." 40 C.F.R. §§ 261.39 & 261.1(c)(8).

123.    Defendant Closed Loop also could not show that the CRT materials had "a feasible means of being recycled." 40 C.F.R. §§ 261.39 & 261.1(c)(8).

124.    According to the EPA, demonstration of a feasible means of recycling "ordinarily will require identification of actual recyclers and recycling technology, location of the recycler, and relative costs associated with recycling," none of which was ever shown or otherwise established by Defendant Closed Loop.

125.    Defendant Closed Loop also never established that:

a.    The crushing of commingled leaded funnel glass and panel glass provided a useful contribution to the recycling process;

b.    The crushed commingled leaded funnel glass and panel glass was a valuable product or intermediate;

c.    A legitimate market existed for the crushed CRT glass that was being generated and accumulated;

d.    The CRTs and crushed CRT glass that were accumulating on the Properties were being managed as valuable commodities; and

e.    The CRTs and crushed CRT glass that were accumulating on the Properties were being managed to prevent a release.

126.   No legitimate market existed for the crushed CRT glass that Defendant Closed Loop was generating given the way it was generated:

          a.    It is standard industry practice to segregate leaded funnel glass from clean panel glass during CRT processing to meet the product specifications of downstream lead smelters;

          b.    It is not economically viable for lead smelters to accept commingled glass from e-waste recyclers, given the need to run over twice as much glass feedstock to extract the same amount of lead;

          c.    The commingled, crushed CRT glass that Defendant Closed Loop generated also was contaminated with steel, wood, and plastic impurities, rendering it unsuitable for lead smelters; and

          d.    The commingled, crushed CRT glass that Defendant Closed Loop generated had insufficient granularity to meet lead smelter specifications.

127.   Nor did Defendant Closed Loop manage the crushed CRT glass at the Properties in an environmentally responsible manner with a concern for product integrity:

a. It is standard industry practice to use new octagon Gaylord boxes with a 2-ton capacity to provide appropriate containment for processed CRT glass;

b. Defendant Closed Loop repurposed many of the same four-sided Gaylord boxes that had previously been used to transport used, intact CRTs to the Properties;

c. As a result, significant portions of the crushed CRT glass spilled out of their Gaylord containers; and

d. Defendant Closed Loop stored CRT materials outside the 59th Ave. Warehouse, despite the EPA's guidance that "storing CRTs outdoors prior to processing is inconsistent with the premise that these materials are commodity-like." 71 Fed. Reg. 42,928, 42,933 (July 28, 2006).

128. The way Defendant Closed Loop processed and stored CRT glass was further evidence that Defendant Closed Loop had no reasonable intention of actually recycling CRT materials as though they were valuable commodities, or that there was any legitimate downstream market for such materials.

129. Used CRTs and crushed CRT glass containing lead at concentrations equal to or greater than 5.0 mg/L using the Toxicity Characteristic Leaching Procedure ("TCLP"), if not managed under the conditional CRT Exclusion, are regulated and must be disposed of as hazardous wastes under RCRA.

130. Total lead content from samples collected at the Properties exceeded the 5.0 mg/L regulatory limits using TCLP.

131. Each of the Arranger/Transporter Defendants learned of Closed Loop's abandonment of hazardous wastes at the Properties, but none of them has cooperated in or otherwise provided funds for the hazardous waste removal and clean-up efforts.

**E.    Plaintiffs Have Undertaken Removal and Clean-Up Efforts at Their Own Expense.**

132.    In addition to cooperating with ADEQ and other state and federal regulatory agencies, Plaintiffs have undertaken numerous efforts at their sole expense to investigate the nature and quantity of the abandoned CRTs and other CRT Waste at the Properties; to protect public health and safety; and to address releases and threatened releases. All costs incurred to date, for which CERCLA cost recovery is sought herein, are consistent with the U.S. EPA National Contingency Plan ("NCP") at 40 C.F.R. Part 300, in keeping with 42 U.S.C. § 9607.

133.    Plaintiffs' removal and clean-up costs have included, but are not limited to:

a.    Retention of an environmental consultant, which performed removal preliminary assessments, removal site inspections and surveys, and records review in accordance with 40 C.F.R. § 300.410, *inter alia*, to: (i) characterize the nature and extent of the abandoned CRTs and CRT waste at the Properties; (ii) identify sources and the nature of releases and threatened releases; (iii) evaluate the magnitude of the threat; and (iv) evaluate factors necessary to determine whether a removal is necessary;

b.    Identify and evaluate potential options and locations for the recycling or, if necessary, disposal of the abandoned CRTs and CRT waste in furtherance of 40 C.F.R. § 300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

c.    Obtaining and evaluating estimates from potential hazardous and electronic waste vendors for the recycling and/or disposal of the abandoned CRTs and CRT Waste and for the removal and/or remedial action at the Properties in furtherance of 40 C.F.R. § 300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

d.   Securing the Properties to prevent unauthorized entry in accordance with 40 C.F.R. § 300.415(b)(1)-(3) and (e)(1);

e.   Directing an environmental consultant to prepare a health and safety plan in accordance with 40 C.F.R. § 300.150(b) to inform personnel participating in onsite activities at the Properties, including contractors performing removal and/or remediation, of the known or reasonably anticipated potential hazards and safety concerns;

f.   Preparing documentation in accordance with 40 C.F.R. 300.160(a)(1), *inter alia*, to (i) identify responsible parties; (ii) describe the source and circumstances of releases or potential releases; and (iii) provide for an accounting of removal and other response costs;

g.   Arranging for an environmental consultant to prepare an Engineering Evaluation/Cost Analysis pursuant to 40 C.F.R. § 300.415(i) to analyze removal alternatives for the Properties;

h.   Commence and conduct a removal action to identify, remove, transport, and dispose of CRTs and CRT Waste from the Properties; and

i    Commence and conduct other clean-up efforts after removal of CRT Waste from the Properties.

134.   Plaintiffs now bring this action to require Closed Loop and the Arranger/Transporter Defendants to clean-up and/or pay for the clean-up of nearly 106 million pounds of CRT Waste that Defendants abandoned at the Properties.

135.   The Arranger/Transporter Defendants participated in and profited from Defendant Closed Loop's sham recycling operations at the Properties, thereby saving millions of dollars in e-waste disposal fees and imposing on Plaintiffs potential liability for millions of dollars in removal and other environmental clean-up costs.

136.   The Arranger/Transporter Defendants selected Defendant Closed Loop as the cheapest possible option on the market to receive and ostensibly "recycle" CRTs and CRT waste.

137.   Given their experience and sophistication in the tight-knit e-waste industry, the Arranger/Transporter Defendants knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.

138.   Given their experience and sophistication in the tightknit e-waste industry, the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop did not qualify for the conditional CRT Exclusion, because the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs and CRT Waste, had no feasible means of recycling CRTs or CRT waste, and otherwise was not engaged in legitimate recycling.

## FIRST CAUSE OF ACTION

### (CERCLA Cost Recovery)

139.   Plaintiffs repeat and reallege the allegations in Paragraphs 1  through 138 of this Complaint as if fully set forth herein.

140.   Section 107(a) of CERCLA, 42 U.S.C. § 9601(a), imposes strict and joint and several retroactive liability on:  (i) "the owner and operator of a vessel or a facility"; (ii) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"; (iii) "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and"; and (iv) "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from

1   which there is a release, or a threatened release which causes the incurrence of response
2   costs, of a hazardous substance."

3          141.    Each Defendant is a "person" as defined by 42 U.S.C. § 9601(21).

4          142.    The Properties constitute a "facility" within the meaning of 42 U.S.C.
5   § 9601(9).

6          143.    Between 2010 and 2016, Closed Loop was the "operator" of the Properties
7   within the meaning of 42 U.S.C. 9601(20)(A).

8          144.    Between 2010 and 2016, Closed Loop and each of the Arranger/Transporter
9   Defendants are persons who (i) by contract, agreement, or otherwise arranged for disposal
10  or treatment, or arranged with a transporter for the transport for disposal or treatment, of
11  hazardous substances at the Properties; and/or (ii) selected the Properties as a site for
12  disposal or treatment of hazardous substances and then transported hazardous substances to
13  the Properties for that purpose.

14         145.    The Arranger/Transporter Defendants arranged for and paid Closed Loop to
15  accept their CRT Waste with the intent that at least a portion of that CRT Waste would be
16  disposed of or treated.

17         146.    Under CERCLA, "disposal" means "the discharge, deposit, injection,
18  dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any
19  land or water so that such solid waste or hazardous waste or any constituent thereof may
20  enter the environment or be emitted into the air or discharged into any waters, including
21  ground waters." 40 C.F.R. § 260.10.

22         147.    Under CERCLA, "treatment" means any "method, technique, or process . . .
23  designed to change the physical, chemical, or biological character or composition of any
24  hazardous waste so as to . . . recover . . . material resources from the waste, or so as to render
25  such waste . . . amenable for recovery, amenable for storage, or reduced in volume."  40
26  C.F.R. § 260.10.

27         148.    Thus, each of the Defendants is an "arranger" and/or "transporter" within the
28  meaning of Sections 107(a)(3) & (4) of CERCLA, 42 U.S.C. §§ 9607(a)(3) & (4).

149.   Closed Loop's CRT "processing" operations between 2010 and 2016 produced commingled leaded and nonleaded glass that did not meet any commercial specification for which a legitimate market existed.

150.   The Arranger/Transporter Defendants knew or had an objectively reasonable basis to believe at the time of their transactions with Closed Loop that (i) CRT Waste shipped to Closed Loop would not be recycled, and (ii) Closed Loop was not operating in compliance with substantive provisions of environmental law.

151.   The Arranger/Transporter Defendants failed to exercise reasonable care with respect to the management and handling of the recyclable material.

152.   The Arranger/Transporter Defendants further failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and CRT Waste it was accumulating.

153.   Between 2010 and 2016, a "release" or "threatened release" of one or more hazardous substances occurred at and/or from the Properties.  42 U.S.C. §§ 9601(22) and (29), and § 9607(a).

154.   CERCLA defines "release" as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

155.   Between 2010 and 2016, hazardous substances, within the meaning of 42 U.S.C. § 9601(14), including (but not limited to) lead, were abandoned and/or otherwise disposed of at the Properties.

156.   Closed Loop's CRT operations at the 59th Ave. Warehouse, which involved crushing leaded glass, released hazardous leaded dust, which has dispersed throughout Closed Loop's leased warehouse space and has become embedded in Closed Loop's

abandoned CRT processing equipment and surrounding structures within Closed Loop's leased warehouse space.

157.   Closed Loop's CRT operations at the 27th Ave. Warehouse, which included stockpiling of CRT Waste, also has released hazardous leaded dust that has collected on the floor and may have been tracked by workers inside Closed Loop's leased warehouse space.

158.   The vast majority of the CRT Waste that Defendants disposed of at the 59th Ave. Warehouse and 27th Ave. Warehouse was abandoned in inappropriate containers (resulting in spills onto the warehouse floors).

159.   A "release or threatened release" occurred at both the 59th Ave. Warehouse and the 27th Ave. Warehouse even though the leaded glass or leaded dust may not have escaped from initial confinement, because Congress expressly defined the term "release" in CERCLA as "including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant."

160.   At the 59th Ave. Warehouse, Defendants also abandoned and disposed of CRT Waste in piles outside the warehouse.

161.   Because of the releases or threatened releases of hazardous substances, Plaintiffs have incurred and will continue to incur necessary response costs within the meaning of 42 U.S.C. §§ 9601(23) and (25), and therefore are entitled to bring this action against Defendants.

162.   To date, Plaintiffs have incurred several millions of dollars in necessary removal and other response costs, and Plaintiffs will continue to incur response costs in the future.   All of Plaintiffs' removal and response costs have been or will be incurred in substantial compliance with CERCLA's NCP, 42 U.S.C. § 9605(a) and 40 C.F.R. Part 300.

163.   Each Defendant is jointly and severally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the removal and response costs Plaintiffs have incurred, and each Defendant is jointly and severally liable for all future costs Plaintiffs may incur that are recoverable under CERCLA.

164.    Plaintiffs are also entitled to statutory interest pursuant to 42 U.S.C. § 9607(a)(4).

**SECOND CAUSE OF ACTION**

**(Declaratory Judgment)**

165.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 164 of this Complaint as if fully set forth herein.

166.    Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiffs are entitled to a declaration of each Defendant's joint and several liability for future costs incurred by Plaintiffs that are recoverable under CERCLA.

167.    This claim also arises under the provisions of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, which authorizes this Court to render declaratory judgment as to the allocation of liability for response costs and damages.

168.    An actual, substantial, and justiciable controversy exists between Plaintiffs and all Defendants regarding their respective rights and obligations for the removal and other response costs and/or damages that have been and will be incurred in connection with the release and/or threatened release of hazardous substances at the Properties.

169.    Declaratory relief is necessary because, without a ruling on the parties' allocation of liability for response costs and damages, Plaintiffs would be forced to bring subsequent lawsuits to obtain contribution for future response costs.

170.    Plaintiffs seek a declaratory judgment against Defendants under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) and 28 U.S.C.§§ 2201-2202, holding all Defendants jointly and severally liable for all removal and response costs incurred and to be incurred at the Properties that will bind the parties in any subsequent action to recover further response costs or damages.

**THIRD CAUSE OF ACTION**

**(Common Law Negligence)**

171.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 170 of this Complaint as if fully set forth herein.

172.    Each of the Defendants owed a duty to Plaintiffs, the owners and managers of the Properties, to use reasonable care to avoid causing reasonably foreseeable damage to the Properties.

173.    A reasonable and prudent person engaged in the transport of, or arranging for the transport of, CRT Waste exercises due diligence on downstream recipients to avoid causing injury to public health, property, or the environment.

174.    At all relevant times, Plaintiffs detrimentally relied on their reasonable expectation and Defendant Closed Loop's representations that Closed Loop would operate in compliance with applicable federal and state hazardous waste laws.

175.    At all relevant times, Plaintiffs detrimentally relied on their reasonable expectation that the Arranger/Transporter Defendants also would operate in compliance with applicable federal and state hazardous waste laws.

176.    Defendants caused damage to Plaintiffs by (i) transporting and arranging for the transport of CRTs and CRT Waste to the Properties when there was no feasible means of recycling CRTs or CRT Waste, and then (ii) abandoning/disposing of CRTs and CRT Waste at the Properties.

177.    As a result of their acts and omissions, Defendants were negligent and breached their duties to Plaintiffs, thereby causing reasonably foreseeable harm and damages to Plaintiffs, as the owners and managers of the Properties.

178.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs were unable to rent or sell the Properties in their contaminated condition and have suffered and continue to suffer physical harm to the Properties as well as economic harm, including, but not limited to, loss of rent, loss of business opportunity, and costs of CRT and CRT Waste removal and other environmental clean-up.

179.    The Defendants' sham recycling scheme was designed to shift the costs of removing the CRTs and CRT Waste and cleaning the Properties to Plaintiffs, the owners and managers of the Properties.

180.    The Defendants knew or should have known that their actions created strict liability under CERCLA and RCRA for owners of properties at which there are threatened releases of hazardous substances or wastes, even when those properties are contaminated by third-parties.

181.    Furthermore, Defendants acted with conscious disregard for the hazards associated with the hazardous substances they handled at the Properties, and through their reckless acts and omissions caused the release or threatened release of hazardous substances and wastes at the Properties for which the owner of the Properties may be held liable under federal and state hazardous waste law.

## REQUEST FOR RELIEF

Plaintiffs Berendo Property, Harrison Properties, L.L.C., Lincoln Industrial, L.L.C., and Predio Management LLC respectfully request entry of judgment in their favor against each of the Defendants, jointly and severally, as follows:

A.    With respect to the First Cause of Action, awarding Plaintiffs their recoverable costs incurred in responding to the releases or threatened releases of hazardous substances from the Properties in the amount of at least $15,000,000.00, with pre-judgment interest pursuant to 42 U.S.C. § 9607(a) from the date of expenditure;

B.    With respect to the Second Cause of Action, declaring each Defendant jointly and severally liable for all future costs recoverable under CERCLA, which Plaintiffs will incur in responding to the releases or threatened releases of hazardous substances from the Properties;

C.    With respect to the Third Cause of Action, awarding Plaintiffs damages in the amount of at least $15,000,000.00;

D.    With respect to all Causes of Action, awarding Plaintiffs their attorneys' fees and costs incurred in connection with this lawsuit pursuant to A.R.S. § 12-341.01 and any other applicable statute, rule, or law; and

E.    Granting such other and further relief in law or equity as the Court may deem proper.

October 7, 2022.

**PEARSON LAW GROUP, LLC**

By: s/ William Pearson
    William W. Pearson
    3509 E. Shea Boulevard, Ste. 117
    Phoenix, Arizona 85028

*Attorneys for Berendo Property and Harrison Properties, L.L.C.*

**PERKINS COIE LLP**

By: s/ Todd R. Kerr
    Todd R. Kerr
    P. Derek Petersen
    2901 North Central Avenue, Ste. 2000
    Phoenix, Arizona 85012-2788

*Attorneys for Lincoln Industrial, L.L.C. and Predio Management LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Certificate of Service**

     I certify that, on October 7, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

s/ Susan Carnall